MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant
By: SERRIN TURNER (ST-0646)
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel. No.  (212) 637-2701
Fax. No. (212) 637-2686

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CRISPINA MIRASOL,

                  Plaintiff,

        v.

CARLOS M. GUTIERREZ, Secretary of Commerce,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

05 Civ. 6368 (DC)

**ECF CASE**

**RULE 56.1 STATEMENT IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Carlos M. Gutierrez, Secretary of Commerce, by his attorney, Michael

J. Garcia, United States Attorney for the Southern District of New York, submits the

following Statement of Undisputed Material Facts in Support of Defendant's Motion for

Summary Judgment, as follows:

**A.      The New York Regional Office**

      1.   The U.S. Bureau of the Census, an operating unit within the U.S. Department

of Commerce, serves as the leading collector of data about the nation's people and

economy.  Declaration of Lester Farthing ("Farthing Decl.") ¶ 2.  Through its Field

Division, the Bureau plans and directs the collection of national census and other survey data, through 12 regional offices across the country.  *Id.*

2.   The NYRO is one such office, whose coverage encompasses 19 counties in New York and New Jersey surrounding the New York City metropolitan area.  *Id.*

3.   The NYRO employs a permanent staff of 46 employees – including management, survey staff, and administrative staff.  *Id.* ¶ 5.

4.   Lester Farthing, known as "Tony," is the NYRO's Regional Director (GS-15), a position he has held since 1996.  *Id.* ¶ 1.

5.   Ligia Jaquez is the Assistant Regional Director (GS-14), and assists Mr. Farthing in overseeing all the operations of the office.  *Id.* ¶ 3.

6.   Ms. Jaquez directly supervises several mid-level managers, including Julia Muniz.  *Id.* ¶ 4.

7.   Ms. Muniz is the Administrative Officer (GS-12) in charge of the office's administrative section, which is staffed by seven employees (including Ms. Muniz herself) and is responsible for personnel, payroll, and other administrative functions.  *Id.*

8.   Purmawatie ("Pearl") Ramnauth, the Administrative Specialist (GS-9), works under Ms. Muniz and is second-in-charge of the administrative section.  *Id.*

9.   Plaintiff is an Administrative Technician (GS-5), a clerical position within the administrative section, and is supervised by Ms. Muniz and Ms. Ramnauth.  *Id.* & Farthing Decl. Ex. D.

10. Employee turnover is low at the NYRO, as many employees tend to stay in the office for ten years or more.  *Id.* ¶ 5.

11. As a result, promotional opportunities within the office are rare.  *Id.*

12. The exception is during decennial censuses or other major survey operations. *Id.*

13. For such operations, the NYRO opens temporary offices within the region.

14. During decennial censuses in particular, a large, temporary Regional Census Center is opened, which in turn serves as the headquarters for dozens of smaller local offices temporarily opened in the region and the thousands of temporary employees that staff them. *Id.*

15. Employees from the NYRO's permanent staff often compete for available positions at these temporary offices since they often involve temporary promotions to a higher grade. *Id.*

16. After the census or survey operation is complete, these permanent employees typically return to the NYRO's main office at their prior position and grade-level. *Id.*

**B.      The Opening of the Temporary Administrative Specialist Vacancy in 2003**

17. In 2003, the NYRO was gearing up to conduct a census "pre-test" in 2004 – a operation in which draft census questionnaires are tested in a preparatory exercise in advance of an actual decennial census. *Id.* ¶ 6.

18. A separate temporary office was to be opened in order to carry out the operation, and Pearl Ramnauth – the NYRO's Administrative Specialist – was to be temporarily detailed to that temporary office to serve as Assistant Manager for Administration.  While Ms. Ramnauth was away on detail, someone else would be needed to fill her place as Administrative Specialist at the NYRO. *Id.*

19. Thus, on July 31, 2003, the NYRO posted a vacancy announcement for a temporary, one-year Administrative Specialist position at the NYRO (the "2003

Administrative Specialist vacancy").  *Id.*; *see also* Declaration of Ligia Jaquez ("Jaquez

Decl."), Ex. A (vacancy announcement).

20. The Administrative Specialist is second-in-charge of the NYRO's

administrative section.

21. As indicated in the vacancy announcement, the posted position was

supervisory in nature and entailed oversight of all aspects of administration.  Jaquez

Decl., Ex. A at 1.

22. The vacancy announcement made clear that, along with the Administrative

Officer, the Administrative Specialist is "[r]esponsible for planning and organizing the

administrative activities in the Regional Office (RO)" and "serves as part of the RO

management team."  *Id.*

23. As also indicated in the vacancy announcement, the Administrative Specialist

is "[r]esponsible for making administrative decisions when higher level managers are not

available," "[i]mplements procedures and periodically reviews the work of lower-graded

employees," "ensure[s] adherence to agency policies and procedures," and "[m]onitors

and evaluates the progress of activities in relation to established goals and schedules."  *Id.*

24. As further indicated in the vacancy announcement, the Administrative

Specialist oversees all aspects of the section's work, covering a diverse range of subject

areas, including, *inter alia*: personnel; payroll; travel authorizations and certifications;

fiscal administration; procurement of supplies, furniture, and equipment; and workplace

safety.  *Id.*

25. The Administrative Specialist at the NYRO supervises employees up to the

GS-6 level.  Farthing Decl. ¶ 15.

**C.      Selection Process for the 2003 Administrative Specialist Vacancy**

26. Applications for the 2003 Administrative Specialist vacancy were submitted through the "Commerce Opportunities On-Line" or "COOL" system – the Department of Commerce's on-line application system in operation at the time.  *See* Declaration of Mary Kennedy ("Kennedy Decl.") ¶ 3.

27. The COOL system used a computer program to automatically score the applicants' submissions, based on the applicants' answers to yes-or-no (or otherwise non-narrative) questions on the application form.  *Id.* ¶¶ 4-10.

28. The "scoring questions" used by the COOL system were divided into four categories: Education, Experience, Awards, and Training/Self-Development.  *Id* ¶ 5.

29. The applicant's overall score would be tallied by adding up her scores in each category according to a weighted formula.  For the 2003 Administrative Specialist vacancy, the Experience score was worth 85% of the overall score.  The Education, Awards, and Training scores made up the remaining 15% of the overall score, with each category worth 5% apiece.[1]

30. In addition to scoring questions, a COOL application form would also typically contain questions asking for narrative information, similar to the type of information that would appear on a resume.  This resume information would *not* be used by the COOL system in computing an applicant's score.  The only role it would play in the scoring process is that the Census Bureau's Human Resources ("HR") Division would

---

[1] This formula appears at the end of vacancy announcement for the 2003 Administrative Specialist vacancy.

have a HR Specialist use it to check for error or fraud in the applicant's answers to the scoring questions. *Id.* ¶ 11.

31. A HR Specialist could not "fine-tune" an applicant's score based on the applicant's resume information. A "yes" answer to a question asking whether an applicant has experience in a certain area is worth the same number of points, regardless of how much or what specific kinds of experience the applicant has in that area. These more fine-tuned judgments would be for the selecting official to make later in the event that the application was referred for further consideration. The only role of the HR Specialist in reviewing the applicant's resume information would be to confirm that there was some plausible basis for the applicant's answers to the yes-or-no scoring questions, and the COOL system would automatically tally the applicant's score based on those questions, according to set weights and a fixed formula. *Id* ¶ 13.

32. Based on applicants' COOL system scores, the HR Division assembled a list of the "best qualified" applicants and referred them to the NYRO for further consideration. *Id.* ¶¶ 14-15.

33. The COOL scores were used only by the HR Division, for the purpose of determining who to refer to the NYRO for further consideration. *Id.* ¶ 15.

34. The candidates' COOL scores were not intended to bind the selecting official or even serve as a factor in his decision-making. *Id.*

35. Pursuant to HR policy, the scores were not passed on to the selecting official or to anyone else at the NYRO during the selection process. *Id.*; Farthing Decl. ¶ 9; Jaquez Decl. ¶ 5

36. Three applicants were referred to the NYRO for further consideration: Elsie McNeill-Gittens, Tonja Jefferson, and the plaintiff.  Jaquez Decl. ¶ 5 & Ex. B.

37. The list was unranked, meaning that the selecting official – Mr. Farthing – was equally free to choose any of the candidates based on his judgment as to who would best fill the duties of the position.  *Id.* ¶ 15; *see also* Farthing Decl. ¶ 9; Jaquez Decl. ¶ 5 & Ex. B.

38. After referral to the NYRO, the three candidates were interviewed on August 29, 2003.  Jaquez Decl. ¶ 6.

39. As is his regular practice, Mr. Farthing delegated the task of interviewing the candidates to Ms. Jaquez, the Assistant Regional Director, and Ms. Muniz, the Administrative Officer.  *Id.* ¶ 2; Farthing Decl. ¶ 7.

40. After completing the interviews and discussing the merits of each applicant, Ms. Muniz and Ms. Jaquez both agreed that Ms. McNeill-Gittens was the superior candidate for the job, based on her greater supervisory experience and broader knowledge of the NYRO's administrative operations.  Jaquez Decl. ¶¶ 6-7; Declaration of Julia Muniz ("Muniz Decl.") ¶ 5.

41. Ms. Jaquez delivered this recommendation to Mr. Farthing, who concurred. Farthing Decl. ¶ 10; Jaquez Decl. ¶ 16; Muniz Decl. ¶ 8.

**D.     Selectee's Qualifications**

42. Ms. McNeill-Gittens was able to demonstrate that she had greater supervisory experience and a broader range of relevant experience than the plaintiff.

43. Ms. McNeill Gittens had worked at the NYRO for over 23 years at the time she applied for the 2003 Administrative Specialist vacancy.  Deposition of Elsie McNeill-Gittens ("McNeill-Gittens Dep.") at 49:22-24.

44. During her long tenure, Ms. McNeill-Gittens had held a variety of positions, through which she had gained substantial supervisory experience and experience across a broad range of areas.

45. During the 1990 Census, Ms. McNeill-Gittens was temporarily promoted to work at the Regional Census Center ("RCC") from June 1988 through September 1991 – first as Administrative Specialist, and then as Administrative Supervisor, a GS-11 position.  *See* Jaquez Decl., Ex. C (McNeill-Gittens application form, hereinafter "McNeill-Gittens Appl.") at 11-12; *see also* Farthing Decl. ¶ 12.

46. As Administrative Supervisor, Ms. McNeill-Gittens was in charge of all aspects of administration for the census operation in the New York region.  *Id.*

47. Her duties in this position included:

- overseeing the processing of personnel and payroll for approximately 45,000 employees at the peak of the census operation;
- controlling inventories of office equipment, furniture, and supplies, and ensuring compliance with federal procurement regulations;
- taking care of property management and payment of all bills;
- preparing fiscal and tax reports and ensuring that all office expenditures were within budget requirements;
- preparing and executing office performance plans;
- ensuring that office facilities complied with worker health and safety requirements and that any accidents were properly reported;
- monitoring compliance with EEO policies and took corrective action where required; and
- supervising and training all administrative staff with respect to processing of personnel and payroll records, time and attendance reports, travel authorizations, purchase orders, vouchers, and miscellaneous invoices.

McNeill-Gittens Appl. at 12.

48. In carrying out these duties, Ms. McNeill-Gittens exercised extensive supervisory authority.

49. She was responsible for supervising an administrative staff of sixty-two employees – including not only clerical employees but also lower-level managers up to the GS-11 level.  *Id.*; Farthing Decl. ¶ 12.

50. She trained these employees, issued their assignments, evaluated their performance, took disciplinary action where required, and made recommendations regarding hiring, promotion, and reassignment.  McNeill-Gittens Appl. at 12.

51. Following her work during the 1990 Census, Ms. McNeill-Gittens was awarded with a Department of Commerce Bronze Medal, a lifetime award that is one of the Department's highest accolades.  McNeill-Gittens Appl. at 7; Farthing Decl. ¶ 12.

52. After the 1990 Census, Ms. McNeill-Gittens returned to her prior position at the NYRO in the survey section of the office, where she worked as a Supervisory Survey Clerk (GS-6), from 1991 to 1997.  McNeill-Gittens Appl. at 10-11; Farthing Decl. ¶ 13.

53. In her capacity as Supervisory Survey Clerk, Ms. McNeill-Gittens supervised a staff of two to three survey clerks on the Current Population Survey ("CPS").  *Id.*

54. In addition, she oversaw the entire CPS operation in the absence of her supervisor.  *Id.*

55. She regularly assigned, monitored, reviewed, edited, and ensured completion of the work of those under her supervision.  McNeill-Gittens Appl. at 11.

56. Ms. McNeill-Gittens was regularly recognized for her superior performance in the position of Supervisory Survey Clerk.  Farthing Decl. ¶ 13 & Ex. A.

57. For the 2000 Census, Ms. McNeill-Gittens again rose to fill a vital temporary position, as Personnel Management Specialist for the NYRO, a position she occupied from 1997 to 2001.  McNeill-Gittens Appl. at 9-10; Farthing Decl. ¶ 14.

58. As Personnel Management Specialist, a high-ranking (GS-12) administrative position, Ms. McNeill-Gittens was responsible for all recruiting and staffing efforts for the NYRO's census operations, which required the hiring of tens of thousands of employees.  Farthing Decl. ¶ 14.

59. In the course of her duties, Ms. McNeill-Gittens acquired extensive knowledge of personnel practices and procedures and applied that knowledge on a daily basis.  McNeill-Gittens Appl. at 9.

60. As Personnel Management Specialist, Ms. McNeil-Gittens was an essential part of the NYRO's management team, working directly with the Regional Director and other upper management on a daily basis and regularly providing advice on personnel issues at management meetings.  Farthing Decl. ¶ 14.

61. She had one to three personnel clerks working under her during this time, whom she interviewed, hired, and trained herself.  *Id.*; McNeill-Gittens Appl. at 9.

62. Additionally, she supervised the entire NYRO on several occasions in the absence of other management.  Farthing Decl. ¶ 14 & Ex. B.

63. Again, Ms. McNeill-Gittens was regularly recognized for her superior performance in this position.  *Id.* ¶ 14 & Ex. C.

**E.     Comparison with Plaintiff's Qualifications**

64. Plaintiff had less supervisory experience than Ms. McNeill-Gittens.

65. At the time she applied for the 2003 Administrative Specialist position, plaintiff had worked at the NYRO for approximately 18 years.  Deposition of Crispina Mirasol ("Mirasol Dep.") 57:25-58:1.

66. During that entire time, she had worked almost exclusively in the same position – as a GS-5 Administrative Clerk (later re-titled Administrative Technician).

Mirasol Dep. 56:6-57:6, 57:25-58:13; Farthing Decl. ¶ 15; Jaquez Decl., Ex. D (Mirasol application form, hereinafter "Mirasol Appl.") at 8-11.

67. Her duties in this position were clerical in nature, consisting primarily of processing paperwork.  Farthing Decl. ¶ 15 & Ex. D (position description for GS-5 Administrative Technician); Mirasol Dep. 80:5-8.

68. Never during her employment at the NYRO had plaintiff held any supervisory title.  Mirasol Dep. 60:24-61:5.

69. The only supervising plaintiff had ever done at the NYRO – and the only position she had ever held at the NYRO besides being a clerk – was during the 2000 Census, when plaintiff was temporarily promoted to serve as Administrative Specialist (GS-9) for a temporary office where census data was reviewed for accuracy.  Farthing Decl. ¶ 15; Mirasol Appl. at 10.

70. In that position, which plaintiff held from 1999 to 2001, plaintiff supervised at most three temporary clerks at any one time, who were GS-3 or GS-4 employees. Farthing Decl. ¶ 15; Mirasol Appl. at 10; Mirasol Dep. 61:6-62:20.

71. Plaintiff's supervisory authority over these temporary GS-3 and GS-4 clerks was limited.  She never had the authority to hire or fire these employees, recommend them for awards, discipline them for poor performance, or approve requests for leave. Mirasol Dep. 73:18-74:2, 74:18-23, 76:16-21.

72. Plaintiff's experience at the NYRO was not as diverse as that of Ms. McNeill-Gittens.

73. Plaintiff had a narrower knowledge of NYRO's administrative operations than Ms. McNeil-Gittens. Farthing Decl. ¶ 16; Jaquez Decl. ¶ 9.

74. During her entire employment at the NYRO, even while serving as Administrative Specialist during the 2000 Census, plaintiff had never held substantial responsibility for property or space management, Mirasol Dep. 88:16-90:20, 99:15-100:4, 101:4-16 & Ex. F.

75. She was never trained in federal procurement regulations and had never been authorized to approve the acquisition of office equipment and supplies. *Id.* at 91:6-8, 100:5-19 & Ex. F.

76. She was never responsible for payment of bills. *Id.* at 90:12-20.

77. She had never been responsible for executing a budget. *Id.* at 91:9-18.

78. She did not know how to use the office's financial management information system (the Cost and Administrative Response Management Network, or "CARMN") . *Id.* at 91:19-23.

79. Ms. McNeill-Gittens had substantial experience in all of these areas. Farthing Decl. ¶ 16; Jaquez Decl. ¶ 9.

80. Plaintiff had performed solely administrative tasks throughout her employment at the NYRO.

81. Ms. McNeil-Gittens had worked for a number of years in the survey operations of the office, in addition to her several administrative positions – experience that was not a requirement for the 2003 Administrative Specialist position, but would nonetheless be an asset in performing the duties of that position. Farthing Decl. ¶ 13; McNeill-Gittens Appl. at 9.

**F.      Interview Performance**

82. In the judgment of Ms. Muniz and Ms. Jaquez, Ms. McNeill-Gittens

performed better than plaintiff during at her interview.  Muniz Decl ¶ 7.  Jaquez Decl. ¶

7.

83. At their interviews, the candidates were each asked an identical series of pre-

determined interview questions.  Jaquez Decl. ¶ 6.

84. The first interview question asked the candidates to describe what experience

they had relating to eight various areas of administration.  Jaquez Decl. ¶ 9.

85.  Ms. McNeill-Gittens was able to point to substantial experience she had in all

eight areas.  *Id.* ¶ 9 & Ex. F at 1.

86. In response to the same question, plaintiff was able to point to significant

experience only in three areas, relating to personnel and payroll; as to the remaining

areas, she stated that her experience was "very limited."  *See id.* ¶ 9 & Ex. G at 1;

Mirasol Dep. 99:15-101:16.

87. Another interview question asked the candidates to specify the greatest

number of employees they had ever supervised.  Jaquez Decl. ¶ 10.

88. Ms. McNeill-Gittens answered that she had supervised approximately 65

employees as Administrative Supervisor during the 1990 Census.  *Id.* ¶ 10 & Ex. F at 2.

89. In response to the same question, plaintiff could recall supervising only two

clerks as Administrative Specialist during the 2000 Census.  *Id.* ¶ 10 & Ex. G at 2;

Mirasol Dep. 107:21-108:7.

90. The next interview question asked the candidates to describe an example of

how they had taken corrective action in the past in response to poor employee

performance.  Jaquez Decl. ¶ 11.

91. In response to this question, Ms. McNeill-Gittens listed the concrete steps a supervisor should take in such circumstances: verbal consultation with the employee; documentation of their poor performance; issuance of a written infraction; and lowering the employee's performance appraisal. *Id.* & Ex. F at 2.

92. In response to the same question, plaintiff stated that she would try to solve the problem by speaking with the employee to find out what the problem was, and if she could not solve it herself she would have to bring it to the attention of her manager. *Id.* ¶ 12 & Ex. G at 2; Mirasol Dep. 108:15-109:16.

93. Plaintiff in fact had never even held the authority to discipline an employee before. Mirasol Dep. 75:3-19.

94. During the interview, Plaintiff had to be prompted several times to supplement her answer to this question. Jaquez Decl. ¶ 12. After plaintiff stated that she would speak with the employee about the problem, Ms. Jaquez repeatedly asked her, "What else would you do?" *Id.*

95. Even with these prompts, plaintiff was unable to give an answer to this question that Ms. Jaquez considered satisfactory.

96. The next interview question asked the candidates what they would do in a hypothetical scenario in which payroll documents arrived late, making it necessary to process payroll on a very tight timeline. *Id.* ¶ 13.

97. Ms. McNeill-Gittens answered that she would ensure that the administrative section would try to process as much of the payroll as possible by the deadline. *Id.* & Ex. F at 2.

98. In response to the same question, plaintiff stated that she would have to refer the problem to higher authority.  *Id.* & Ex. G at 2; Mirasol Dep. 109:17-110:21.

99. Ms. Jaquez again had to prompt plaintiff to supplement her answer, asking her, "Would you present higher authority with your recommendation?"  Jaquez Decl. ¶ 13.  When plaintiff answered yes, Ms. Jaquez, in her interview notes, added "with my recommendation" next to plaintiff's answer, but she underlined it, indicating that plaintiff said this only with prompting.  *Id.* & Ex. G at 2.  Ms. Jaquez further jotted in her notes that plaintiff's answer indicated that she was "not very willing to take extra steps or to provide input."  *Id.*

100. Another interview question asked the candidates whether they had ever had to terminate an employee under their supervision.  Ms. McNeill-Gittens answered yes, and that she understood the process.  Plaintiff answered no.  Jaquez Decl. ¶ 14 & Exs. F & G at 3; Mirasol Dep. 112:18-24.

101. Finally, candidates were asked to describe the skills, talent and experience they would bring to the position.  Jaquez Decl. ¶ 15.

102. Ms. McNeill Gittens took this opportunity to discuss her broad array of experience covering 23 years at the NYRO, including 11 years of administrative experience, many years of survey experience, and her special assignment as Personnel Management Specialist during the 2000 Census in which she gained extensive knowledge about personnel regulations and merit performance systems.  *Id.* & Ex. F at 4.

103. In response to the same question, plaintiff stated, "I have exercised my skills and will continue to do so."  *Id.* & Ex. G at 4.

104.    Ms. McNeill-Gittens was already familiar with all key administrative areas and had proven capable in the past of exercising supervisory authority – well beyond what would be entailed in the 2003 Administrative Specialist position.  Farthing Decl. ¶ 18.

## G.    Filing of Discrimination Complaint

105.    Ms. McNeill-Gittens was notified of her selection by email on September 17, 2003; plaintiff was informed of the selection on the same day.  *See* Compl. ¶ 31.

106.    On October 31, 2003, plaintiff contacted an EEO Counselor about the non-selection.  Turner Decl., Ex. E.

107.    Subsequently, on January 21, 2004, plaintiff filed a formal administrative complaint of discrimination based on her Asian race and Filipino national origin and submitted to the jurisdiction of the Equal Employment Opportunity Commission ("EEOC").  Compl. ¶ 6; Turner Decl. Ex. F.

108.    On May 19, 2005, plaintiff requested a voluntary dismissal of her case from the EEOC so that she could pursue a civil action in federal court, which request was granted on May 23, 2005.  Compl. ¶¶ 7-8.

109.    On July 12, 2005, plaintiff filed the instant Complaint.

## H.    Selection of Ms. Ramnauth for Administrative Specialist Position in 2002

110.    Pearl Ramnauth, whose temporary promotion to Assistant Manager for Administration at a special temporary office created the temporary Administrative Specialist Vacancy in 2003, was originally selected to fill the permanent Administrative Specialist position at the NYRO in 2002.  Farthing Decl. ¶ 20.

111.    Mr. Farthing was the selecting official responsible for Ms. Ramnauth's selection.  *Id.*

112.    Likewise, Ms. Muniz reviewed candidates' applications, interviewed candidates, and passed her recommendations on to Mr. Farthing for the selection of Administrative Specialist when Ms. Ramnauth was selected for the permanent position in 2002.  Declaration of Julia Muniz ("Muniz Decl.") ¶ 10.

113.    Ms. McNeill-Gittens, who was selected for the temporary Administrative Specialist position in 2003, also applied for the position in 2002.  Farthing Decl. ¶ 20.

114.    In 2002, Ms. Muniz recommended, and Mr. Farthing selected, Ms. Ramnauth, who is Asian, over Ms. McNeill-Gittens, who is African-American.  *Id.* Muniz Decl. ¶ 10.

By submitting this statement, defendant does not waive his right to contend that any of the above-referenced facts are not material to the present action.

Dated:          New York, New York
                October 10, 2006

                                MICHAEL J. GARCIA
                                United States Attorney for the
                                Southern District of New York
                                Attorney for Defendant

                        By:      /s/ Serrin Turner              _
                                SERRIN TURNER (ST-0646)
                                Assistant United States Attorney
                                86 Chambers Street
                                New York, New York 10007
                                Tel: (212) 637-2701
                                Fax: (212) 637-2686